People v Godwin (2025 NY Slip Op 25161)

[*1]

People v Godwin

2025 NY Slip Op 25161

Decided on July 15, 2025

Criminal Court Of The City Of New York, Bronx County

Ortner, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on July 15, 2025
Criminal Court of the City of New York, Bronx County

The People of the State of New York

against
Paul Godwin, Defendant.

Docket No. CR-021282-24BX

People: Bronx County District Attorney's Office by Michael Briggs, Esq.
Defendant: The Bronx Defenders by Ivan Marchena, Esq. 

Craig J. Ortner, J.

On April 1, 2025, Defendant Paul Godwin pleaded guilty to one count of Aggravated Harassment in the Second Degree, in violation of Penal Law § 240.30 (4). The People allege that the defendant and complainant [FN1]
, E.R., were members of the same family or household, to wit, that they were in an intimate relationship, and filed CPL § 370.15 notice. Defendant denies the relationship. As discussed herein, the significance of this dispute is that if the relationship alleged were established, Defendant's conviction would then be designated a "serious offense" (CPL § 370.15). That, in turn, would impact his ability to lawfully own or possess a firearm in the future.
On May 13, 2025, the Court held a hearing pursuant to CPL § 370.15. For the reasons discussed below, the Court determines that the People have met their burden of establishing that the defendant and complainant are in or were in an intimate relationship. Therefore, Defendant's conviction for Aggravated Harassment in the Second Degree (Penal Law § 240.30 [4]) constitutes a "serious offense" and must be reported to the state division of criminal justice services in accordance with CPL § 370.15. 
PROCEDURAL HISTORY
On August 18, 2024, the defendant was arrested in connection with the instant matter. [*2]Defendant was arraigned on a criminal court complaint the next day, August 19, 2024. At the arraignment, the People filed and served notice pursuant to CPL § 370.15 stating that "the defendant and victim are in or were in an intimate relationship" and that the defendant is charged with a qualifying crime (People's CPL § 370.15 Notice). 
On October 18, 2024, the People filed and served a superseding information (SSI) signed by the complainant on October 1, 2024. In the SSI, the complainant affirmed, inter alia, "that she and the defendant are former intimate partners." On November 20, 2024, the defendant appeared in court and was arraigned on the information. The People carried over all previously filed notices from the August 19, 2024 criminal court arraignment.
On April 1, 2025, the defendant pleaded guilty to Aggravated Harassment in the Second Degree (Penal Law § 240.30 [4]) and was sentenced to a conditional discharge and a five-year full and final order of protection in favor of the complainant. Pursuant to CPL § 370.15, the Court asked the defendant whether he admitted to being in a current or former intimate relationship with the complainant as alleged in the People's CPL § 370.15 notice. Defendant denied any such relationship. The matter was therefore adjourned for a CPL § 370.15 hearing.
On May 13, 2025, the Court held the CPL § 370.15 hearing. The People called one witness, Officer Liam San Giorgio, and moved five items into evidence: the handwritten complaint report (People's exhibit 1); the domestic incident report (DIR) (People's exhibit 2); the complainant's medical records (People's exhibit 3); Officer San Giorgio's body-worn camera footage (BWC) (People's exhibit 4); and the SSI filed on October 18, 2024 (People's exhibit 5). The defense did not call any witnesses or introduce any evidence.

FINDINGS OF FACT
On August 18, 2024, at approximately 5:00 a.m., the defendant and complainant were at the defendant's apartment, when the complainant attempted to leave (People's exhibit 2). The defendant grabbed the complainant's hair, threw her to the floor, and struck her in the nose, resulting in a laceration and bleeding (People's exhibit 1; People's exhibit 2; People's exhibit 5). The defendant's mother called the police (People's exhibit 2 at 2).
At 5:40 a.m., Officer San Giorgio, who was working as a member of the NYPD, responded (hearing tr [tr.] at 13, lines 17-22). When Officer San Giorgio entered the apartment, he observed the defendant and complainant in the kitchen (id. at 14, lines 5-7). The complainant and defendant were standing in an embrace, with the complainant's shirt appearing to be covered in blood (People's exhibit 4 at 3:46; tr. at 14, lines 6-7). Officer San Giorgio asked the complainant and defendant to step out of the kitchen (tr. at 14, lines 10-11). Officer San Giorgio observed that the defendant appeared intoxicated and confused (id. at 14, line 13; at 19-20). Defendant told the officer, "Me and my girlfriend had an argument" (People's exhibit 4 at 3:49). The defendant's mother, who was also present in the apartment stated, "that's not your girlfriend . . . she don't want you" (People's exhibit 4 at 3:51; tr. at 20, lines 20-24).
After the defendant was placed in handcuffs, Officer San Giorgio escorted him outside and directed him to the back of a marked police vehicle (People's exhibit 4 at 15:14). Defendant repeatedly asked to speak to the complainant, stating, "can I just say something to my baby before I go?" and "can I just say something to my wife?" (id. at 12:37; 15:38). Defendant also told Officer San Giorgio that he wanted to tell the complainant, "Baby, I love you" (id. at 12:37).
While Officer San Giorgio escorted the defendant outside, another officer, Officer Miguel Rojas, spoke with the complainant and prepared a DIR (tr. at 23, lines 14-15; People's [*3]exhibit 2). Officer Rojas filled out the first page of the DIR, where he provided a description of the incident based on the complainant's statements. Officer Rojas also indicated that the defendant and complainant were "intimate partner[s]/dating." (People's exhibit 2 at 1). The complainant filled out the second page of the DIR, where she wrote a statement of the allegations and signed under penalty of perjury (id. at 2).
Later that morning, at around 6:39 a.m. the complainant sought treatment at a hospital for a nasal laceration and facial swelling (People's exhibit 3 at 5). The complainant informed the emergency department nurse that she had been assaulted "by her boyfriend" and that "police arrested the boyfriend" (id. at 21). 

CONCLUSIONS OF LAW
In New York, when a person is convicted of a felony or "serious offense" he or she is barred from obtaining a firearms related license (Penal Law § 400.00). However, until 2018, the term "serious offense" did not explicitly include misdemeanor crimes of domestic violence. Concerned about the association between domestic violence and shootings, the New York State Legislature in 2018 enacted new laws to include within the definition of "serious offense" misdemeanor crimes involving domestic violence. The stated purpose of these laws was to prohibit domestic violence perpetrators, whether convicted of felonies or misdemeanors, from obtaining firearms (see Senate Introducer's Mem in Support of 2018 NY Senate Bill 8121).
Among the provisions of the 2018 bill were the additions of Penal Law § 265.00 (17) (c) as well as CPL §§ 370.15 [FN2]
and 370.25 (see 2018 Senate Bill 8121). These provisions convert certain misdemeanor crimes into "serious offenses" when committed against a member of the same family or household and place specific obligations on the court, including notifying the relevant authorities that a defendant has been convicted of a "serious offense" (Penal Law § 265.00 [17] [c]; CPL § 370.25 [1]).
CPL § 370.15 outlines the procedure for determining the status of those misdemeanors that only constitute "serious offenses" when committed against a member of the same family or household. First, CPL § 370.15 (1) provides an exhaustive list of qualifying misdemeanor charges, including Aggravated Harassment in the Second Degree.[FN3]
When a defendant is charged with a qualifying offense, the People must, within 45 days of arraignment, file and serve "notice [*4]alleging that the defendant and the person alleged to be the victim of such crime were members of the same family or household," as defined in CPL § 530.11 (1). (CPL § 370.15 [1]). "Such notice shall include the name of the person alleged to be the victim of such crime and shall specify the nature of the alleged relationship" (CPL § 370.15 [2]).
Upon conviction of a qualifying misdemeanor offense, the court must determine whether the defendant and victim are related in the manner described in the People's notice. This can occur one of two ways: if the defendant admits to the relationship, the inquiry is satisfied. If the defendant denies the relationship, or remains silent, then the court must conduct a hearing solely on the issue of the nature of the defendant's relationship to the victim as alleged in the People's notice (CPL § 370.15 [2]).
At a CPL § 370.15 hearing, the People bear the burden of establishing beyond a reasonable doubt that the defendant and complainant were related or situated in the manner alleged in the People's notice (CPL § 370.15 [3]). The court may consider relevant, reliable hearsay [FN4]
 (id.). Additionally, "[f]acts previously proven at trial or elicited at the time of entry of a plea of guilty shall be deemed established beyond a reasonable doubt andshall not be relitigated" (id.).
This Court is unaware of any appellate, or even persuasive authority on CPL § 370.15 hearings. Thus, this case appears to be one of first impression, at least in Bronx Criminal Court. The Court is guided, therefore, by the statutory text of CPL §§ 370.15, 530.11, and case law on adjacent issues, including the interpretation of CPL § 530.11 in other contexts. 
As the People's CPL § 370.15 notice alleges that the defendant and complainant "are in or were in an intimate relationship," the Court must decide whether the People have established such relationship beyond a reasonable doubt.
Defining Intimate Relationship
The Criminal Procedure Law does not explicitly define "intimate relationship." Rather, CPL § 530.11 provides a non-exhaustive list of factors that the court may consider when determining whether the parties were in such a relationship.[FN5]
These factors include "the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship" (CPL § 530.11 [1] [e]). The CPL further provides that an intimate relationship is not a "casual acquaintance nor ordinary fraternization between two individuals in business or social contexts" (id.). "Because the Legislature declined to include a definition of the term 'intimate relationship' . . . courts should [*5]construe the term using its usual and commonly understood meaning" (Matter of Jessica D. v Jeremy H., 77 AD3d 87, 89-90 [3d Dept 2010] [determining, for purposes of family court jurisdiction, that two people were in an intimate relationship under Family Ct Act § 812 (1) (e), which contains identical language to CPL § 530.11 (1) (e)] [internal quotation marks and citations omitted]).
Intimate relationships, which have been the subject of plays, poems, and songs for millennia, are multi-faceted and complicated. Determining whether two people are in, or were in, an intimate relationship requires that courts adopt a holistic approach and engage in a "case-by-case" analysis (see Seye v Lamar, 72 AD3d 975, 976 [2d Dept 2010]; see also Jessica D., 77 AD3d at 89-90 [finding that an intimate relationship was established where the parties had an intermittent sexual relationship and periodically lived together]; People v Brabant, 229 AD3d 892, 894-895 [3d Dept 2024] [holding the defendant's admission that he and the victim were in an intimate relationship, despite maintaining separate residences, sufficient to establish that they were members of the same family or household]; People v Shortell, 146 AD3d 1076, 1077 [3d Dept 2017] [finding a legally sufficient basis for an intimate relationship where the defendant lived with the victim "most of the time" for three years, the defendant and victim were sexually intimate, and the defendant referred to the victim as "his girl"]). 
Here, the Court finds that the People have met their burden of establishing beyond a reasonable doubt that the defendant and complainant are in or were in an intimate relationship. In making this determination, the Court considers the following factors: both the complainant and defendant referred to each other using terms commonly associated with romantic partners; the complainant was at the defendant's residence during early morning hours; the complainant and defendant demonstrated physical intimacy; and the complainant and defendant acted with familiarity indicative of an intimate relationship.
First, the Court notes that the complainant and defendant referred to each other using terms traditionally associated with romantic, or intimate relationships. As depicted on Officer San Giorgio's body-worn camera footage, the defendant called the complainant his "girlfriend," "wife," "my lady," and "my baby" (People's exhibit 4 at 3:49; 5:49; 8:04; 9:08; 15:38). As Officer San Giorgio led the defendant to the back of the police car, the defendant stated, "Can I just say something to my baby before we go? . . . I need to just say, 'baby I love you.'" (Id. at 12:37). The complainant also referred to the defendant as her "boyfriend" and "intimate partner" in multiple sources. In the superseding information, signed by the complainant under penalty of perjury on October 1, 2024, the complainant affirmed that she and the defendant are "former intimate partners" (People's exhibit 5). The complainant's medical records from the hospital, where she was admitted less than one hour after Officer San Giorgio arrived on scene, reflect that the complainant reported being "assaulted by her boyfriend," and that she further informed hospital staff that "police arrested the boyfriend" (People's exhibit 3 at 5, 21).
In addition to the complainant's and defendant's words, their behavior was also consistent with that of intimate partners. For instance, the complainant was present at the defendant's apartment at the early hour of 5:00 a.m. when the incident occurred. Additionally, Officer San Giorgio's BWC shows the complainant and defendant standing in an embrace until the police asked them to step outside of the kitchen (People's exhibit 4 at 3:46). Standing alone, an embrace or presence in another adult's apartment at an early hour might not be sufficient to establish an intimate relationship. But when considered together and in light of the way the defendant and complainant each independently and repeatedly referred to each other, they paint the picture of [*6]an intimate relationship (see Brabant, 229 AD3d at 894-895; Shortell, 146 AD3d at 1077).
Defendant argues that the People have not met their burden of establishing an intimate relationship. Specifically, he avers that the People's evidence fails to establish the duration of the relationship or detail how many times the defendant and complainant interacted, both of which are factors listed in CPL § 530.11 (1) (e). Defendant also avers that the People fell short by only calling Officer San Giorgio to testify as he did not interview the complainant but rather spoke only with the defendant. The defense argues that the Court should not credit the defendant's statements referring to the complainant as his "wife," "girlfriend," etc. because he made such statements while intoxicated and they are merely indicative of wishful thinking. As evidence of wishful thinking, the defense points to the fact that the defendant's mother can be heard on Officer San Giorgio's BWC, stating "that's not your girlfriend . . . she don't want you" (People's exhibit 4 at 3:51).
The Court is not persuaded by these arguments. Although the People did not establish the duration of the relationship or frequency of interactions, these are not necessary elements for establishing an intimate relationship. Rather, they are factors that a court "may consider" (CPL § 530.11 [1] [e]). As for Defendant's argument that Officer San Giorgio's testimony was insufficient, the Court would be more persuaded if there were no other evidence in addition to his testimony. However, the People's evidence included medical records, police reports, and sworn statements by the complainant. Similarly, although Defendant may have been intoxicated while speaking with the police, the Court did not consider his statements in a vacuum. Rather, the Court also took into consideration the complainant's statements as well as both individuals' actions. In fact, even Defendant's mother's statement, "that's not your girlfriend," which was made at the defendant's residence shortly after 5:30 a.m., taken in context, indicates a certain familiarity with the complainant—the natural inference being that this is more than a casual acquaintance.

CONCLUSION

Pursuant to CPL § 370.15, the Court finds that the defendant, Paul Godwin, and victim, E.R., were members of the same family or household in that that they were in an intimate relationship as defined by CPL § 530.11 (1) (e). Therefore, Defendant's conviction of Aggravated Harassment in the Second Degree (Penal Law § 240.30 [4]), to which he pleaded guilty on April 1, 2025, constitutes a "serious offense." Accordingly, Defendant's conviction shall be reported to the state division of criminal justice services within three (3) business days of this decision as one in which the defendant and the victim were members of the same family or household as defined in CPL § 530.11 (1) (see CPL §§ 370.15 [1]; [2]). Defendant is hereby ordered to immediately surrender any firearms, rifles, or shotguns in his possession (CPL § 370.25).[FN6]

The foregoing constitutes the opinion, decision, and order of the Court.
Dated: July 15, 2025
Bronx, New York
Hon. Craig J. Ortner, J.C.C.

Footnotes

Footnote 1:The Court uses the terms "complainant" and "victim" interchangeably throughout this decision.

Footnote 2:Technically, Bill 8121 repealed the previous version of CPL § 370.15 and enacted a completely new statute in its place (2018 Senate Bill 8121).

Footnote 3:Here, the CPL § 370.15 notice designates Assault in the Third Degree as the "serious offense" for purposes of the statute. As noted above, Defendant pleaded guilty to Aggravated Harassment in the Second Degree. However, Defendant never challenged the adequacy of the notice despite fully litigating the relationship issue, thus waiving any objections (see People v Garcia, 290 AD2d 299 [1st Dept 2002]). Furthermore, on its face CPL § 370.15 does not require that the People specify which offense they intend to rely on in establishing that the conviction was for a "serious offense." As the notice contains the name of the victim and specifies the nature of the relationship, the Court deems the notice adequate.

Footnote 4:The statute does not define what constitutes "reliable hearsay." As Defense did not object to any of the People's evidence, this Court need not delve into this issue. However, it is worth noting that the Court of Appeals has deemed hearsay to be reliable in the context of Sex Offender Registration Act hearings, "if, based on the circumstances surrounding the development of the proof, a reasonable person would deem it trustworthy" (People v Mingo, 12 NY3d 563, 574 [2009]).

Footnote 5:CPL § 530.11 dictates procedures for family offense matters and confers concurrent jurisdiction over criminal and family courts for certain acts or offenses committed against "members of the same family or household," which is defined in subsection one.

Footnote 6:Defendant has not indicated that he possesses firearms, rifles, or shotguns. Still, the Court gives this instruction in an abundance of caution.